Maxine **AUBUSCHON**, Appellant,

v.

John **WITT**, Respondent.

No. 51610.

Supreme Court of Missouri,
Division No. 2.

Feb. 13, 1967.

Rehearing Denied March 13, 1967.

Hubert I. Binowitz, St. Louis, for plaintiff-appellant.

R. E. Keaney, Moser, Marsalek, Carpenter, Cleary & Jaeckel, St. Louis, for respondent.

PRITCHARD, Commissioner.

The jury verdict and judgment were against plaintiff in her $65,000 action for personal injuries she alleged were sustained as a result of an automobile collision which occurred in the state of Illinois on Highway 50 Bypass.

The issues involve (1) whether plaintiff was entitled to have given her offered and refused Instruction No. C: "If you find the issues in favor of plaintiff, and if you find that plaintiff's injuries were not accurately diagnosed by her physician and as a result thereof plaintiff suffered damage, you are instructed defendant is liable to plaintiff for such damage. 'Not in MAI.'", embodying the legal proposition that the risk of improper treatment rendered by the physician is borne by the tort-feasor; (2) whether the trial court erroneously sustained an objection to plaintiff's closing argument that the validity of the discogram (a diagnostic procedure) was not in issue; (3) whether the trial court erred in permitting defendant's counsel in argument to inform the jury that absence of two of plaintiff's medical witnesses allowed the adverse inference that their testimony would be unfavorable; (4) whether the trial court erred in allowing defendant to argue that he was not guilty of driving the trailer which struck plaintiff onto the wrong side of the road; (5) whether under the best evidence rule there was error in permitting defendant's medical witness to testify as to results of a discogram experiment without producing X-rays; (6) whether there was error in giving for defendant Instruction No. 4 permitting the jury to find that it was not the result of negligence on defendant's part that caused or permitted the trailer to travel on the left half of the highway, or that plaintiff was not damaged as a direct result of the negligence submitted in Instruction No. 3, in that it was given without evidence to support it and was contrary to the direction of Missouri Approved Instructions; and (7) whether the court erred in permitting defendant to argue that Dr. Schaerer, a medical witness, was a "Swiss" and had a "Swiss accent" as invoking base prejudices on the part of the jurors serving to deny plaintiff a fair trial.

As to issue (1) above, plaintiff says that the risk of improper treatment rendered by the physician is borne by the tort-feasor, a proposition which has long been recognized, not only in Illinois, which is the law governing this case, but by the majority of other jurisdictions, including

Missouri, citing Pullman Palace Car Co. v. Bluhm, 109 Ill. 20; 100 A.L.R.2d 815.

Defendant's two-wheel trailer (belonging to a Boy Scout Troop) became detached from his truck and struck plaintiff's husband's automobile, in which she was a passenger, in the side. After the collision, which happened on November 25, 1962, plaintiff stated to a man that she didn't believe she was hurt, but after leaving the scene her neck started "burning" and swelled slightly on the left, and she vomited. She went to Centerville Hospital and was seen subsequently by a Dr. Anderson who administered heat treatments, later ultrasonic treatments and medication for pain, which she never had before the collision. At Dr. Anderson's recommendation plaintiff saw Dr. Lloyd Hill on December 20, 1962, who in turn referred her back to Dr. Anderson whom she saw until March, 1963. She had learned of Dr. Jacques P. Schaerer, a neurosurgeon, from friends, and she requested her Illinois counsel to make an appointment for her, which he did.

Plaintiff saw Dr. Schaerer, whose discography techniques are questioned with respect to Instruction No. C, above, once a month until May, 1963. She entered Missouri Baptist Hospital at which time a dye was inserted into her neck (the challenged discogram diagnostic technique for ascertaining ruptured cervical discs). Dr. Schaerer saw plaintiff once a month until September, 1963, when she again entered the hospital when two discs were removed from her neck and a bone from her hip was grafted in her neck.

Dr. Schaerer testified that plaintiff's discogram X-rays showed the left side of the 4th, 5th, 6th and 7th cervical vertebrae with a radio-opaque substance being introduced by two-needle technique in the disc. At the time of injection of the dye, plaintiff experienced pain in the left shoulder with most of the pain in the right shoulder and arm. The dye was going to the right side, while in a normal disc the substance remains in the center except in older persons.

The extrusion to the right of the dye means a space or cleavage present in the tough outer right of the annulus fibrosis which represents a tear, a disc that is not functioning properly, but the main significance in plaintiff's case was pain produced by the injection.

After the operation, plaintiff's recuperation was uneventful, and on October 27, 1963, Dr. Schaerer noted that she had considerable improvement with no attacks of pain, but there was spot tenderness. She still has limitation of the spine from the presence of the bone dowels. Her injuries would give her difficulty in her occupation as a seamstress. X-rays taken January 21, 1964, showed a better position and alignment (of the vertebrae) and on August 26, 1964, an X-ray showed the result to be good.

Discography is a relatively new controversial procedure requiring experience. Dr. Schaerer had performed discograms since 1960, and recently published an article in a medical journal. He lectured on the subject in 1962 in Switzerland and Germany. He discussed the risks of discography with plaintiff, a potential risk of carrying germs on the skin into the depth and produce inflammation of the disc. He has performed probably between 300 and 400 discograms in the neck, averaging probably two injections each. Out of 195 patients 98% have had what he considers to be abnormal, deranged, herniated or ruptured discs. Of the 14 neurosurgeons practicing in St. Louis only Dr. Schaerer uses the discogram as a diagnostic procedure. It could not be ascertained from the actual removal of the disc whether it had been herniated or ruptured.

Dr. Earl P. Holt, M.D., specializing in orthopedic surgery, testified for defendant. He has performed discograms which he described as a test in which a sterile, hollow needle is introduced into an intervertebral disc. The procedure consists of injection of a small amount of radio-opaque material which would cast a shadow on an X-ray

which is taken immediately after so that the pattern of distribution can be shown. Dr. Holt did research study during the course of which he performed discographies on patients or people who have no complaints of injury or pain or disability in their necks. According to Dr. Holt, it appeared at first glance to be something which might be useful in establishing whether a disc in the neck was ruptured. He performed a few on patients and was struck by the fact that they were all positive. He set out to find a group of individuals with no neck pain at all and no neck injury and no history of an old injury. He was permitted to make a study of inmates at the Missouri State Penitentiary in the early fall of 1963, of whom, after screening, he found fifty between the ages of 21 and 50. On testing every one of forty-nine had a positive discogram—the majority of them had leakage of the contrast material (opaque dye) or extra-vasation of the so-called abnormal pattern in at least two of the three spaces tested—of the 148 discs tested in this manner, 138 or 93 and a fraction per cent were positive. In the positive pattern the material injected had appeared to run out in one or the other direction and could be detected by X-ray.

Dr. Holt's opinion was that the use of the discogram for the purpose of diagnosis was quite invalid and misleading—a cervical myelogram is of diagnostic value which is rather time-honored and is of known value, and to date is the proper test to apply. Dr. Henry E. Lattinville testified that from his familiarity with the discogram he concluded that it was unreliable because most persons over 20 years of age have degenerated discs which permit the leaking of the dye, which also leaked in his experience when he jiggled the pressure and re-injected the dye. In Dr. Lattinville's opinion the discogram has no diagnostic value.

■ It is undoubtedly the law in Illinois, Pullman Palace Car Co. v. Bluhm, supra; Chicago City Ry. Co. v. Saxby, 213 Ill. 274, 72 N.E. 755, 68 L.R.A. 164; Variety Mfg. Co. v. Landaker, 227 Ill. 22, 81 N.E.

47; Horney v. St. Louis & Northeastern Ry. Co., 165 Ill.App. 547, that an injured plaintiff may recover from the original tort-feasor damages for additional harm for misdiagnosis by her physician. Respondent so concedes. The law is such in many other jurisdictions. Anno. 100 A.L.R. 2d 808. There is a requirement in Illinois and other jurisdictions that the plaintiff use ordinary care in the selection of her physician. Pullman Palace Car Co., supra; 100 A.L.R.2d 815. It is doubtful that the evidence created an issue that plaintiff herself was negligent in selecting her physician, but we need not consider whether Instruction No. C should have submitted that proposition for a finding, as urged by defendant. We note that the regular damage instruction (No. 6, MAI No. 4.01) is: "If you find the issues in favor of the plaintiff, then you must aware the plaintiff such sum as you believe will fairly and justly compensate the plaintiff for any injuries and damages you believe she sustained and is reasonably certain to sustain in the future as a *direct result* of the occurrence mentioned in evidence." (Emphasis added.) Thus, it is apparent that the regular damage instruction covered the entire injury theory of plaintiff, and there was no limitation or restriction upon plaintiff's right to argue to the jury the matter of recovery for not only the original injury but for any further damage occasioned by treatment which would directly and proximately result from the negligence of defendant. The instruction given (being short and simple) follows that required by MAI. We find no error in refusing Instruction No. C, and that issue is ruled against plaintiff.

■ As to issue (2) above, the record reveals that on closing argument plaintiff's counsel said: "Take these instructions and read them two times, three times, four times. They don't say in here anywhere if you find the discogram was a bad technique. If you do find for Mr. Witt, I dare Mr. Keaney to point out that sentence, because it had no bearing in this situation. MR. KEANEY: Your Honor, I'm going to object to that.

There may not have been any instruction submitted to the jury. He is inferring I did not submit such an instruction. THE COURT: Objection sustained." Plaintiff says the ruling limited her in making an observation in argument which was consistent with the instructions. Nothing was mentioned in the instructions except the issues of negligence, no negligence, and damages. The argument was not consistent with the instructions given. As pointed out by defendant in his objection and here, the argument does infer that he should have offered such an instruction. The court's ruling was not error.

■ Defendant argued that the jury might infer that from the nonproduction as witnesses two of plaintiff's treating and examining physicians, Dr. August and Dr. Hiebert, that their testimony would be contrary to the position "they" (meaning plaintiff) now take. Although it would have been better to have used a word other than "contrary" to argue the permissible inference (Block v. Rackers, Mo., 256 S.W.2d 760, 764; Williams v. Ricklemann, Mo., 292 S.W.2d 276, 283) that such testimony would be unfavorable, there is no error. We do not attribute to counsel's word "contrary" in the context used, Webster's New Twentieth Century Dictionary, Unabridged, 1963, plaintiff's urged definition, "altogether different, opposite, in an opposite direction, antagonistic or opposed." There are other definitions: "Opposed to one's interests or desires; *unfavorable* or prejudicial." (Our emphasis.) Webster's New International Dictionary, 2nd Ed., Unabridged. Under medical testimony (Dr. Lloyd James Hill) in the case, which we do not detail, there was a question as to whether plaintiff suffered a disc injury in the collision. Thus, it was a permissible inference that the absent physicians' testimony would be "contrary" to other testimony that she thus had such injury. The contention is ruled against plaintiff.

With respect to issue (4) above, the facts are: John Witt was operating a Chevrolet pickup truck upon which he had attached a steel bumper assembly, which he had made. The bumper assembly, being welded to the frame, had a hole in it for a trailer bar. A chain was welded to the tongue of the two-wheel trailer with its two ends going forward from it. For the trip on the day of the collision, Witt himself connected the trailer hitch to the back of the truck, by loosening a long screw, sliding the wedge back and dropping the tongue over the ball on the truck. Then the wedge was pushed forward by running the screw back down to where it locked under the ball so it could not raise off. Then the chains (two ends) on the tongue were brought forward and bolted onto the bumper itself on the truck. He screwed down with pliers the lock to prevent the bolt threads from unscrewing. At the time the trailer (being loaded with Boy Scout equipment for an overnight trip) came loose from the pickup truck, Witt made a left turn onto Highway 50, and while he was still in low gear he heard an abnormal noise. He slowed and the trailer came up even with his left side, slid on at an angle with the highway with the tongue making sparks. The left front corner of the trailer slid into the side of the Aubuschon car, which was then stopped, at the front door pushing it in. Witt's speed was 15 miles an hour or less at the time he heard the noise indicating that something was wrong. Witt had moved over to the right so there was room for the trailer to go between him and the Aubuschon car, and he stopped directly across from it.

After the collision Witt made an examination of the hitch on the back of his truck. The ball was still in the socket and its shaft was broken off. He had been using the hitch on the back since he built it and put it on. The ball was a purchased item, it being a continuous piece with the shaft which was threaded and protruded through the boiler plate and a reinforced lock washer and a large nut were locked up underneath the bumper. A link of chain was welded to the shaft of the trailer with two ends thus provided to go forward to the bumper. The

free end of each part of the chain was placed around the bumper, with a bolt through the chain—the way the Scout trailer had always been used, and he merely used it as they had.

On cross-examination, Witt testified that the chain welded to the tongue was one chain, anchored in the center. The chain did not break at the weld but its links broke. He had the ball about two years and it was not very old when he obtained it.

Plaintiff read into evidence portions of the motor vehicle statutes of Illinois relating to the definition of a motor vehicle (every device in, upon or by which any person or property is or may be transported or drawn upon a highway, here a Boy Scout trailer), driving on the right side of the highway, and passing vehicles proceeding in opposite directions on the right, and the requirement that trailers have, in addition to the regular coupling device, suitable and adequate safety chains or devices attached to the corners of the trailer frame of sufficient strength to pull the trailer and its maximum load, and provided that trailers having a gross weight of 3,000 pounds or less may be coupled to the towing vehicle by means of clamp-on hitches which hitches shall be designed and installed to effectively transfer stresses to the chassis of the towing vehicle, and of sufficient strength to hold and control such trailer when fully loaded. Such trailers shall be equipped with two safety chains or cables which are permanently affixed to the tongue of the trailer, the two free ends of which shall be attached to the towing vehicle.

■ The verdict-directing Instruction No. 3 submitted negligence of defendant in causing or permitting the trailer to travel on the left half of the roadway. Defendant's converse Instruction No. 4 submitted that it was not the result of any negligence on his part that caused or permitted the trailer to travel on the left half of the highway. Plaintiff says that in permitting defendant's counsel to argue, "Did he drive the trailer over there?" was error because even if such

act were not done it would constitute no defense to plaintiff's submission of causing or *permitting* (emphasis plaintiff's) the trailer to travel to the left, which includes an act of omission rather than commission. The overruling of plaintiff's objection to the argument, she says, validated the same as a defense, and the law does not permit counsel to urge theories of defense which conflict with the trial court's instructions or which extend beyond the issues in the case (to which defendant agrees.) As noted, plaintiff read in evidence the statute relating to *driving* vehicles on the right side of the highway. The issue here is obviously whether there was a violation of the statute in the use of devices to attach the trailer to the truck, which if so would be negligence proximately causing (or permitting) the trailer to become detached and travel to the left into collision. It was not *driving* the trailer to the left, and in this circumstance defendant had a right to comment on it. The jury could not have been misled, and this is amply demonstrated by consideration in full of the questioned argument:

> "Now the Court has told you—here's the instruction concerning liability, that the defendant caused or permitted the trailer to travel on the left half of the roadway. You heard the statutes of Illinois. Did he drive that trailer over there?
>
> "MR. BINOWITZ: Your Honor, that is contrary to the definitions under the statutes.
>
> "THE COURT: Objection overruled.
>
> "MR. KEANEY: If Mr. Witt drove that trailer over to the wrong side of the highway with his truck, then there is no question about it, but that is the very thing they are telling you may not do, and that isn't what he did at all. This trailer, through no fault of his, broke. The Court tells you you have got to find he was negligent in causing or permitting it to get over there."

■ Plaintiff's next point, (5) above, that the X-ray films taken by Dr. Holt dur-

ing the course of his experiments on fifty inmates of the State Penitentiary is the best evidence and it was error to permit Dr. Holt to testify as to the results of the X-rays, is not well taken under the facts of this case. The record reveals that Dr. Holt had some 11 or 12 slides which were shown to the jury with his explanation of what he found. Plaintiff's right to cross-examine him with respect to the X-rays he took was not infringed, considering also that there was no demand for their production. Besides, X-rays, being subject to expert testimony as to their interpretation, would not in and of themselves be the best evidence as showing the fact or condition on their face without technical explanation. See 32A C.J.S. Evidence § 792(7), p. 124. The point is overruled.

Instruction No. 4, given for defendant, told the jury that their verdict must be for defendant *"if you believe"* that it was not the result of any negligence on his part that caused or permitted the trailer to travel on the left half of the highway, and that plaintiff was not damaged as a direct result of the negligence submitted in Instruction No. 3. (See notes and comments on the use of the words "if you believe," "if you do not believe," and "unless you believe." MAI No. 29.01 et seq.)

■ We deem that the instruction, although ineptly using the words "if you believe" rather than "if you do not believe," was a true converse instruction requiring no evidence to support it, "because, absent a judicial admission by a litigant having the negative that the testimony in favor of the litigant having the affirmative and the burden was true, the credibility of the witnesses giving oral testimony establishing the affirmative remains for the jury." Kimbrough v. Chervitz, 353 Mo. 1154, 186 S.W.2d 461, 464 [3, 4]; Terrell v. Missouri-Kansas-Texas Railroad Co., Mo., 327 S.W.2d 230, 234. The argument that the instruction, by its use of the words, "if you believe" made it an affirmative con-

verse instruction, was ruled in the case of Morris v. Klein, Mo.App., 400 S.W.2d 461, 464, 466, where plaintiff's verdict-directing instruction required a finding of causation and defendant's instruction required a verdict "if you believe that plaintiff's injuries were not directly caused by defendant's failure to operate his automobile on the right half of the roadway." The court held that it was not correct that the mere use of the affirmative words "if you believe" shifted the burden away from the plaintiff and cast upon defendant the burden of proving the absence of causation, and summarizing, "[a] true converse instruction—one which merely negates one or more of the essential elements of plaintiff's case—does not require evidence to support it; and this is true even though it is ineptly prefaced by the affirmative phrase 'if you believe' instead of the proper negative phrase 'if you do not believe.'" Issue (6), above, is ruled against plaintiff.

■ The argument about which plaintiff complains under issue (7), above, must also be ruled against her because she made no objection thereto nor did she request any other relief. Olsten v. Susman, Mo., 391 S.W.2d 328, 330 [3–6]. The claimed inflammatory matter above alluded to is not such as to require our consideration under plaintiff's cited cases of Amsinger v. Najim, 335 Mo. 528, 73 S.W.2d 214; Robbins v. Brown-Strauss Corp., 363 Mo. 1157, 257 S.W.2d 643; and Beer v. Martel, 332 Mo. 53, 55 S.W.2d 482. Issue (7) is ruled against plaintiff.

The judgment is affirmed.

BARRETT and STOCKARD, CC., concur.

PER CURIAM:

The foregoing opinion by PRITCHARD, C., is adopted as the opinion of the Court.

All of the Judges concur.